UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KYLE ANDREW CAMPBELL,<br><br>Defendant. | Case No. 24-CR-268 (RDM)<br><br>18 U.S.C. § 111(a)(1) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Kyle Andrew Campbell to 27 months of incarceration, three years of supervised release, $2,000 in restitution, and a $100 mandatory assessment. This recommendation represents the midpoint of the agreed upon guidelines range as calculated by the parties, as well as the Presentence Report.

**I.     INTRODUCTION**

The defendant, Kyle Andrew Campbell, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The

Campbell breached the West Front with other rioters and rushed up to the front of the mob on the West Plaza, where he pushed multiple times against United States Capitol Police officers wearing riot gear as they formed a line to protect the Capitol from the mob. This kicked off one of the most violent clashes between officers and rioters that day. The government recommends that the Court sentence Campbell to 27 months of incarceration for his conviction of violating 18 U.S.C. § 111(a)(1). A 27-month sentence reflects the gravity of Campbell's conduct, but also acknowledges his early admission of guilt.

II.   **FACTUAL BACKGROUND**

   A.   **The January 6, 2021 Attack on the Capitol**

The government refers the Court to the stipulated Statement of Offense filed in this case, ECF No. 28, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

*Injuries Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our

---

Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

### B.        Campbell's Role in the January 6, 2021 Attack on the Capitol

*Approach to the Capitol*

Kyle Campbell, who traveled from Ohio to Washington, D.C. with a friend from home, participated in the January 6 attack on the Capitol, directly engaging with police on the West Front. His crimes are documented through a series of footage filmed by others in the crowd on January 6, 2021 and body worn camera footage from the Metropolitan Police Department.

Campbell traveled to Washington, D.C. from his home in Ohio—arriving in Washington, D.C. around noon on January 6, 2021. Campbell and his friend started walking toward the "Stop the Steal" rally near the Ellipse, but on the way, they encountered large groups of people walking toward the U.S. Capitol.  At that point, Campbell and his friend decided to change course, and walked directly to the U.S. Capitol building instead of their original destination.

Because the rally was still in progress, Campbell and his friend were among the first rioters to push past barricades and snow fencing adorned with "AREA CLOSED" signs on the West Front—at the site of the initial breach—at approximately 1pm.



*Exhibit 1.2: Campbell grabs onto and goes past snow fencing set up by U.S. Capitol Police*

Campbell then approached the Capitol and pushed his way on the West Plaza to the front of the crowd, face to face with officers in riot gear who were trying to stop the rioters from entering further into the Restricted Area toward the Capitol building itself.

### Assault on Law Enforcement

Once at the front of the crowd on the West Plaza, Campbell and others engaged with police officers who had formed a line between the riotous mob and the Capitol building. Officers were specifically trying to protect the Southwest staircase (which had scaffolding for the construction of the inaugural stage) because that staircase would be a pivotal access point for the mob to climb up to the Upper West Terrace and enter the Capitol building itself.



*Exhibit 2.1: Campbell at the front of the mob on the West Plaza*

Officers were in riot gear, with helmets and riot shields lined up edge to edge to form a wall of officers protecting this staircase. After making his way to the front of the mob, another rioter pushed on Campbell causing his back make contact with one of the officer's riot shields who was forming the police line. Instead of trying to get out of the situation, Campbell stretched out and stiffened his left arm to push harder on the shield, attempting to knock the officer back and almost causing the officer to lose his balance.

Then, rather than leave the scene or retreat back into the crowd, Campbell backed up a bit, steadied himself, and then deliberately ran head-first into the police shield and proceeded to push with his full body weight and both hands on the officer's shield.



*Exhibit 2.2: Campbell pushing on officer's shield on the West Plaza*



*Exhibit 2.3: Campbell pushing on officer's shield with both hands*

After losing his grip on the police shield, Campbell continued to use the weight of his body to push on other rioters who were trying to push the police line. Though Campbell and his friend then stepped back behind a few rows of rioters to wipe Campbell's eyes (which seem to have been sprayed by officers during his attack) and watched the further violence that broke out against officers, the damage had been done. Campbell's participation in one of the initial acts against the police line in front of the Southwest staircase helped to further embolden the mob from that point forward on the West Plaza, resulting in a bloody scene with officers attacked by rioters who eventually gained access to the Southwest stairs.



*Exhibit 2.4: Aftermath of the violent attack rioters mounted against the police line*

After Campbell's violent clash with officers attempting to hold the police line, Campbell and his friend remained in the mob as the violence escalated. Campbell's brazen actions as part of the initial push of rioters against this police line helped to kick off this violent scene and emboldened other rioters to attack officers on the West Plaza. Campbell—though he had stepped back to wipe his eyes—remained in the mob looking on during this violence against police that he had helped start.

### Remaining on Capitol Grounds

Subsequently, police officers were able to re-form the police line and began pushing rioters away from the south side of the West Plaza. At that point, Campbell and his friend relocated, ascending to the Upper West Terrace of the Capitol building, which had been overrun.



*Exhibit 2.5: Campbell finally turning to leave once the police had reestablished their line*

But Campbell didn't leave then—instead, he and his friend climbed to the Upper West Terrace after it was eventually breached through more violent conduct by the mob.



*Exhibit 3: Campbell on the Upper West Terrace*

Once he had gained access to the Upper West Terrace, Campbell continued to remain for approximately an hour at the Capitol among the rioters even after seeing and participating in the violence against officers trying to protect the Capitol.

### III.   THE CHARGES AND PLEA AGREEMENT

On June 3, 2024, the government filed a criminal information charging Campbell with one count: Assaulting, Resisting, or Impeding Certain Officers, in violation of Title 18, United States Code, Section 111(a)(1). On, July 1, 2024, Campbell was convicted of that offense based on a guilty plea entered pursuant to a plea agreement.

### IV.   STATUTORY PENALTIES

Campbell now faces sentencing on Assaulting, Resisting, or Impeding Certain Officers, in violation of Title 18, United States Code, Section 111(a)(1).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Campbell faces up to 8 years of imprisonment, a supervised release term of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

As agreed upon by the parties, and as correctly calculated in the PSR (*see* PSR ¶¶ 35-43), the guidelines analysis is as follows:

Count One: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[2] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **17** |

*See* Plea Agreement at ¶¶ 5(A).

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 48. Accordingly, with a criminal history category of I and a total adjusted

---

[2] Section 2A2.2(a) applies via cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

offense level, after acceptance of responsibility, of 17, Campbell's Guidelines imprisonment range is 24 to 30 months' imprisonment. PSR ¶¶ 83-84. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

VI.  **SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)**

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

A.  **Nature and Circumstances of the Offense**

As shown in Section II(B) of this memorandum, Campbell's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Here, Campbell was at the front of the mob confronting police officers and physically pushed on an officer's shield and other rioters in an attempt to break the police line. The nature and circumstances of Campbell's offense was of the utmost seriousness, and fully support the government's recommended sentence of 27 months.

B.  **Campbell's History and Characteristics**

Campbell's criminal history further supports a period of incarceration. As reflected in the plea agreement and in the presentence report, Campbell has several criminal convictions:

- November 5, 2010: Prohibited Alcohol Under 21, Littering (240 days custody, suspended, 3 years and 1 day probation)
- July 1, 2015: Disorderly Conduct (misdemeanor) (arrested on assault) (probation)
- Nov. 30, 2018: Physical control of a vehicle while under the influence of drugs (misdemeanor) (arrested on DUI)

13

The defendant's crimes on January 6 were not an isolated event in an otherwise law-abiding life. They represent, instead, a troubling escalation of behavior that shows disregard for the law. The defendant's history and characteristics, including his history of arrest and conviction for previous assaultive behavior, weigh heavily in favor of a lengthy term of incarceration.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Campbell was violent toward officers. He pushed on an officer's shield with both hands and the full weight of his body. Campbell's criminal conduct on January 6 was the epitome of disrespect for the law. *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D. The Need for the Sentence to Afford Adequate Deterrence

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, although Campbell has a criminal history category of I, his history of arrest and conviction shows evidence of prior assaultive behavior. *See* Section VI(B) *supra.* Second, although Campbell has now expressed remorse and contrition, his statements immediately after January 6 were those of a man who was proud of his conduct. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### E. The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F. Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have

16

sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[5] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Galetto*, 21-CR-517 (CKK), the defendant assaulted an officer near the Lower West Tunnel by pushing into the officer and his shield as he attempted to hold the police line—similar to Campbell's conduct on the West Plaza. Galetto also hung around the Capitol well after the assault and after witnessing additional violence against officers, much like Campbell. In *Galetto*, based on the same calculation of guidelines as in this case, the Court sentenced Galetto to 27 months' imprisonment, followed by 24 months of supervised release and ordered him to pay

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

restitution in the amount of $2,000. Like in this case, both defendants were convicted by a guilty plea acknowledging their violation of 18 U.S.C. § 111(a)(1), with a Criminal History Category of I, and were both in very violent areas of the riot on January 6 pushing on a police shield. The Court also recently denied Galetto's motion to reduce his sentence.

In *United States v. Lockwood*, No. 1:23-CR-00146 (RDM), this Court sentenced a defendant who was convicted of 18 U.S.C. § 111(a)(1) via plea agreement with a similar guidelines range to 12 months and 1 day of incarceration, 36 months of supervised release, and restitution of $2,000. However, in *Lockwood*, the defendant grabbed an officer's baton while the officer was using the baton to rightfully attempt to subdue a rioter who had fallen to the ground and was swinging a flagpole. The assault in *Lockwood* also took place much later in the day at approximately 4:38pm—well after the mob had successfully stopped the certification. This is very different from the case at hand where there was no scuffle—instead, Campbell affirmatively lunged forward to push the officer's shield on the police line. Campbell did this at a much earlier point in the attack, right after the initial breach of the restricted perimeter, well before rioters gained access to the Capitol building and stopped the certification. Unlike Lockwood, Campbell's assaultive conduct directly contributed to the mob's impetus and eventual ability to overcome law enforcement that day to enter the Capitol and stop the certification. Though the conduct is punishable under the same statute, the context which is appropriate in the sentencing setting shows why Campbell's sentence should justifiably be much higher than that imposed in *Lockwood*.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Campbell must pay $2,000 in restitution, which reflects in part the role Campbell played in the riot on January 6.[7] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has been updated by the Architect of the Capitol, USCP, and MPD.) Campbell's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[7] Unlike under the Sentencing Guidelines for which the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

of the Capitol and other victim entities. *See* PSR ¶ 102.

## VIII. FINE

The defendant's conviction for a violation of 18 U.S.C. § 111(a) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendant's financial assets set forth in the PSR, and his representation by appointed counsel, suggest that the defendant is unable, and is unlikely to become able, to pay a fine.

## IX. CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 27 months of incarceration, three years of supervised release, $2,000 in restitution, and a $100 mandatory assessment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:  /s/ *Victoria A. Sheets*
VICTORIA A. SHEETS
Assistant United States Attorney
NY Bar No. 5548623
601 D Street, N.W.
Washington, D.C. 20001
(202) 252-7566
Victoria.Sheets@usdoj.gov